## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SIL CAAM, LLC,

<b>Plaintiff,</b>

v.

<b>1:11-cv-4011-WSD</b>

RBC BANK (USA) (INC.),

<b>Defendant.</b>

## OPINION AND ORDER

This matter is before the Court on SIL CAAM, LLC's ("Plaintiff" or "SIL CAAM") Motion for Temporary Restraining Order [1].  A hearing on the Motion was held on December 8, 2011.

## I.    BACKGROUND

On or about November 30, 2007, Mulberry-Lakeside Auburn, LLC, ("Borrower") executed a Purchase Money Mortgage ("Mortgage") and Commercial Promissory Note ("Note") with RBC BANK USA Inc. ("Defendant" or "RBC" or "Originator") in the amount of $11,809,000.00.  (Exs. A, B to Compl.).  The Note matures on December 11, 2011, and is secured by a Mortgage on real property, a residential rental complex, located in Lee County, Alabama (the "Property").  (Note § 2.2; Ex. A to Mortgage; Ex. G to Compl.).  The Note was

also personally guaranteed ("Personal Guarantees") by Michael V. Shannon, Chad

T. Cottrell, and Paul V. Kilpatrick ("Personal Guarantors").  (Compl. ¶ 6).

On or about February 26, 2008, RBC entered into a participation agreement

(the "Agreement") with Silverton Bank, N.A. ("Silverton").  (Ex. B to Def.'s

Opp'n to Pl.'s Mot. for Prelim. Inj. and/or TRO).  The Agreement identifies

Silverton as the "Participant" and RBC as the "Originator."  (Agreement at 1).

Under the Agreement, Silverton purchased $5,750,000 of principal owed under the

Note.  (Id.).

The Agreement contains a number of key provisions that are important to

this litigation.

Section 7(b) provides:

Except as provided in Section 15 with respect to items (iv), (v) and
(vi) below, Originator may not, without prior consent and concurrence
of Participant:

> (i) make or consent to any amendments in, or waiver of, the
> terms and conditions of the Loan which would reduce the
> interest rate payable on the Loan, change the amount of any
> principal payment on the Loan, reduce the amount of any fee
> payable under the Loan, change the due date of any principal or
> interest payment under the Loan, or extend or renew the term of
> the Loan;

> (ii) waive or release any claim against Borrower or against any
> Guarantor under the Loan;

(iii) make or consent to any release, substitution or exchange of any material portion of the collateral securing the Loan;

(iv) accelerate payment under the Loan;

(v) commence any type of collection proceeding against Borrower or against any Guarantor under the Loan; or

(vi) seize, sell, transfer, assign, foreclose or attempt to levy on any collateral securing the Loan.

Section 15, in pertinent part, provides:

(a) Originator shall, upon having knowledge thereof, inform Participant of any material default under the Loan and any actions taken by Originator in connection therewith.  Upon default by Borrower, Originator shall consult with Participant to determine a mutually acceptable course of action to take with respect to such default, it being agreed that if Originator and Participant cannot agree upon a mutually agreeable course of action, then the decision of Originator, acting reasonably shall determine what action should be taken.  Such decision of Originator may include accelerating the Loan and proceedings to realize upon the collateral securing the Loan.

Section 17, in pertinent part, provides:

[I]f any proceeding is commenced which involves the dissolution, termination of existence, insolvency, or business failure of Participant, or the appointment of a receiver of any part of the property of Participant . . . or if any state or federal agency shall assume regulatory or supervisory control of Participant or if for any other reason Participant is prohibited from performing its obligations under this Agreement, then Originator shall make all decisions relating to the Loan, the security therefore and the Loan Documents with the same force and effect as if Originator owned the whole Loan;

Section 18, in pertinent part, provides:

Participant shall not, without the prior written consent of Originator which consent shall not be unreasonably withheld, sell, pledge, assign, sub-participate, or otherwise transfer any of Participant's rights under this Agreement or Loan.

Section 24, in pertinent part, provides:

This Agreement may be amended or the provision hereof waived only by an agreement in writing signed by the parties. . . . This agreement shall be governed by the substantive laws of the State of North Carolina, excluding, however, the conflict of law and choice of law provisions thereof.

On May 1, 2009, the Office of the Comptroller of the Currency closed Silverton and the Federal Deposit Insurance Corporation ("FDIC") was named Silverton's receiver ("FDIC-R").  (Compl. ¶ 9).

On or about November 30, 2009, Plaintiff alleges that FDIC-R assigned Silverton's participation interest in the Note, Mortgage, and Personal Guarantees to The Brand Banking Company ("Brand Banking").  (Id. ¶ 10).  On or about March 19, 2010, Plaintiff alleges that Brand Banking assigned it an interest in the Note, Mortgage, Personal Guarantees, and Agreement.  (Id. ¶ 11).

On June 10, 2010, Defendant sent a Notice of Default to the Borrower and Personal Guarantors notifying them that "an 'Event of Default' has occurred and is continuing under the Loan Documents."  (Ex. D to Compl.).  Defendant explained that the Event of Default arose "from the failure of Borrower to cause the Property

to achieve a Debt Service Coverage Ratio of not less than 1.20 to 1.00 for the twelve (12) calendar month period ending November 30, 2009." (Id.).  RBC demanded a "Principal Curtailment" payment of $2,027,675.00 to meet the Minimum Debt Service Coverage Ratio and to cure the default, demanding also the Borrower's "strict adherence to the terms of the Notes and other Loan Documents in the future." (Id.).

The Borrower and Personal Guarantors, through counsel, contested the requirement to maintain a Minimum Debt Service Coverage Ratio and, as of May 12, 2011, had not paid the demanded Principal Curtailment. (Exs. E, G to Compl.).

On April 29, 2011, Plaintiff, through counsel, notified RBC that it believed the Agreement had been violated and upon Borrower's uncured default, "the amounts due under the Note should have been accelerated and/or enumerated remedies should have been pursued." (Ex. F to Compl.).  Plaintiff further advised RBC that it believed it had "effectively modified the terms of the loans by its 'course of dealing' with the Borrower without SIL CAAM's consent" and "should have immediately implemented the default interest rates set forth in the Loan Documents." (Id.).  SIL CAAM also notified RBC that it "does not consent to any

forbearance by RBC, as lender, or its rights pursuant to the Loan Documents or any modification to the terms thereof." (Id.).

On May 12, 2011, Defendant notified Borrower that it remained in default for failing to pay the Principal Curtailment and that "an additional Event of Default under the Mortgage and the other Loan Documents" had occurred since there were "an inordinate number of residential units in the Property . . . not in 'rent ready' condition and therefore not generating rental income," in violation of Section 5 of the Mortgage. (Ex. G to Compl. at 2). Defendant demanded that the Borrower comply with the terms of the Mortgage and bring all vacant units at the Property into a "rent ready" condition. (Id.).

On or before June 6, 2011, Defendant learned that Plaintiff's representative had contacted the manager of the Property seeking information about the finances and status of the Property. (Ex. H to Compl.). On June 6, 2011, Defendant wrote to Plaintiff stating, among other things:

> The Participation Agreement between the Bank and the Participant confers upon the Bank the exclusive authority and responsibility for the administration and servicing of the Loan, including communicating with representatives of the Borrower and the property manager regarding the Loan and the Property. The Participant is not permitted to make direct contact with the Borrower or the property manager.

(Id.).  Defendant concluded its June 6, 2011, letter by stating:  "The Bank reserves all its rights and remedies under the Participation Agreement."  (Id.).

On September 30, 2011, Defendant responded to a letter from Plaintiff in which Plaintiff demanded certain information and action by RBC regarding the Property.  (Ex. I to Compl.).  Defendant notified Plaintiff of its intention to grant an extension of "the Loan for a period of twelve (12) months from the current maturity date of December 10, 2011."  (Id.).  Defendant, in explaining its reasoning for granting an extension, told Plaintiff that "pursuant to Section 15 of the Participation Agreement, the decision of the Bank shall determine the action to be taken."  (Id.).  Defendant concluded this letter by stating:  "The Bank reserves all its rights and remedies under the Participation Agreement."  (Id.).

On November 10, 2011, Plaintiff filed its Complaint in the Superior Court of Gwinnett County seeking a declaratory judgment, a temporary restraining order ("TRO"), an interlocutory injunction, and damages.  (Compl. at 1).  Plaintiff seeks a declaration that RBC may not, pursuant to Section 7(b) of the Agreement, "change the due date of any principal or interest payment under the Loan, or extend or renew the term of the Loan."  (Id. ¶ 28).  As grounds for seeking a TRO, Plaintiff argues that it will suffer an unarticulated irreparable harm if "RBC is

allowed to extend the maturity date of the Loan with Borrower despite the language of [Section] 7(b) of the Participation Agreement."  (Id. ¶ 34).

In the Complaint, Plaintiff asserts three claims for breach of contract.  The Complaint also states that Plaintiff will suffer breach of contract damages due to: (1) its lost share of default interest payments arising from the failure of RBC to implement the default interest rate; (2) RBC's failure to accelerate the loan to Borrower and foreclose on the collateral securing the Note; (3) RBC's failure to initiate proceedings against Borrower under the Note and Mortgage for its default; and (4) RBC's failure to "exercise the authority to manage the Property and collect the rents generated therefrom."  (Id. ¶¶ 46, 51-52, 58, 73, 75).  Plaintiff also asserts claims of breach of good faith and fair dealing, anticipatory breach of contract, and self-dealing.  (Id. ¶¶ 64, 69, 84).

On November 21, 2011, Defendant removed the action to this Court based on diversity jurisdiction.  On November 22, 2011, Defendant filed its Answer to the Complaint and asserted as its Sixth Defense that "Plaintiff lacks standing to assert some or all of the claims in the Complaint."  (Def.'s Answer at 2).  In its Answer, Defendant also did not admit that Brand Banking took an assignment from FDIC-R of Silverton's participation interest in the loan; that Plaintiff acquired Brand Banking's interest in the loan; or that "Plaintiff is now, by assignment, the

"Participant" in the Participation Agreement with Defendant RBC." (Compl. ¶¶ 10-12; Def.'s Answer at 3).

On December 7, 2011, Defendant filed its Opposition to Plaintiff's Motion for Preliminary Injunction and/or TRO and claimed, among other things, that "Plaintiff is not the 'Participant' as defined in the Participation Agreement." (Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. and/or TRO at 1 n.1).

## II.   DISCUSSION

### A.   Temporary Restraining Order

To be eligible for a temporary restraining order or preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, a movant must establish "that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); accord Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005); Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (per curiam); Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004). "A preliminary injunction is an extraordinary and drastic remedy

not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989) (quotation marks omitted). "The burden of persuasion in all of the four requirements is at all times upon the [movant]." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1284 (11th Cir. 1990) (quotations omitted). Failure to show any of the four factors is fatal, the most common failure being not showing a substantial likelihood of success on the merits. See, e.g., Schiavo, 403 F.3d at 1226 n.2, 1237; Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994); Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987).

Every injunction or TRO order must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail - and not by referring to the complaint or other document - the act or acts restrained or required." Fed. R. Civ. P. 65 (d)(1).

B.    Standing to assert claims

The threshold question the Court must consider is one of jurisdiction, namely whether Plaintiff has standing to bring this action. Defendant claims that Plaintiff has failed to meet its burden of persuasion to show that Plaintiff became a party to the Agreement and thus does not have standing to request injunctive relief.

The Court agrees that Plaintiff has failed to meet its burden on this fundamental preliminary requirement.

Article III of the Constitution limits the federal judicial power to the resolution of "cases" or "controversies." Allen v. Wright, 468 U.S. 737, 750 (1984); Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471 (1982); Lynch v. Baxley, 744 F.2d 1452, 1455 (11th Cir. 1984). For the Court to have subject matter jurisdiction, a real case or controversy must exist at all stages throughout the litigation. Chiles v. Thornburgh, 865 F.2d 1197, 1202 (11th Cir. 1989). Federal courts lack subject matter jurisdiction where intervening events in an action render the claims moot. United States v. Shenberg, 90 F.3d 438, 440 (11th Cir. 1996).

A litigant must also have "standing" to bring a lawsuit in federal court, Valley Forge Christian College, 454 U.S. at 471, and must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions," Baker v. Carr, 369 U.S. 186, 204 (1962). To prove standing, a plaintiff must show "(1) that he has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed

by a favorable ruling."  Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir. 1994) (en banc).

    Plaintiff here has fallen considerably short in showing, factually or legally, that it is entitled to assert an action for injunctive relief.  The Agreement is governed by North Carolina law and is interpreted according the plain meaning of its terms.[1]  There is an unambiguous provision in the Agreement that requires the prior written consent of the Originator to assign or otherwise transfer any rights a Participant may have under the Agreement.  (Agreement § 18).  Defendant, in its pleadings, has denied that Plaintiff is the Participant or that Plaintiff is entitled to bring a claim under the Agreement.

---

[1] The law of contract interpretation in North Carolina is clear, well-settled, and requires the Court to determine the meaning of contractual terms.  See Washburn v. Yadkin Valley Bank and Trust Co., 660 S.E.2d 577, 583 (N.C. Ct. App. 2008). "Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." Hemric v. Groce, 609 S.E.2d 276, 282 (N.C. Ct. App. 2005).  "If the contract's plain language is clear, the intention of the parties can be inferred from the contract's words."  Meehan v. Am. Media Int'l, LLC, 712 S.E.2d 904, 914 (N.C. Ct. App. 2011).  "If the language is clear and only one reasonable interpretation exists, 'the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.'" Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 524 S.E.2d 558, 563 (N.C. 2000) (quoting Woods v. Nationwide Mut. Ins. Co., 246 S.E.2d 773, 777 (N.C. 1978)).

Plaintiff has the burden of persuasion and must present some evidence to show that the prior written consent of the Originator was obtained before the Agreement was, as Plaintiff claims, assigned by Brand Banking to Plaintiff. Plaintiff also is obligated to show that Brand Banking was a party to the Agreement and had an interest it was entitled to assign to Plaintiff. That is, Plaintiff must show that Brand Banking was assigned, properly, the participation interest in the Agreement.

At the hearing, Plaintiff did not proffer any evidence showing that a proper, enforceable assignment was made to Brand Banking and did not present any evidence to support finding a proper, enforceable assignment was made to Plaintiff. (Tr. of Hr'g at 3:17-19, 4:17-20, 7:5-6, 12:22-25). Plaintiff candidly acknowledged that it cannot show that Defendant had consented to either the assignment to Brand Banking or the claimed assignment to Plaintiff, as Section 18 of the Agreement requires. (Id.). Plaintiff was unable to provide any legal authority to support that Plaintiff had enforceable rights in the Agreement in the absence of the required consent. Defendant proffered that its corporate custodian of records examined the entire file on the Note, Mortgage, and Agreement, and that it does not contain prior written consents to any assignment and, specifically, there

is no evidence of a consent to any assignment of rights under the Agreement by either FDIC-R or Brand Banking to Plaintiff.  (Id. at 6:1-8, 13:6-10).

The Court necessarily concludes that Plaintiff has not met its burden to show it is entitled to enforce any rights under the Agreement and the Court thus finds that Plaintiff lacks a substantial likelihood of demonstrating standing, and thus, success on the merits.

At the hearing, Plaintiff argued that even if it cannot show consent was obtained, compliance with Section 18 was not required because Section 18 became unenforceable when the FDIC-R assumed the assets and liabilities of Silverton. The Court disagrees.  When the FDIC assumes control over a failed banking institution, it stands in the shoes of that entity and assumes all its rights and liabilities in its assets.  See Resolution Trust Corp. v. United Trust Fund, Inc., 57 F.3d 1025, 1031, 1036 (11th Cir. 1995).  While the FDIC-R may repudiate contracts and leases of failed institutions, the FDIC-R possesses no inherent authority to rewrite the contracts of institutions that it takes over.  See 12 U.S.C. § 1821(e); FDIC & WRH Mort., Inc. v.. S.A.S. Assocs. et al., 44 F. Supp. 2d 781, 784-85 (E.D. Va. 1999) ("nothing in either the language or legislative history of FIRREA reveals that Congress also wanted [to provide the FDIC] either the right

to unilaterally modify or alter contracts pursuant to the will of the FDIC"), aff'd, 214 F.3d 528 (4th Cir. 2000).

Plaintiff has not offered any legal authority for the argument it makes. Besides being unprecedented, Plaintiff's argument is illogical and commercially unreasonable.  Contracting parties do not lose their contract rights in those occasions where regulatory authorities are required to take over failed banks and do not repudiate its contracts.  See FDIC, 44 F. Supp. 2d at 785.

Here, the plain language of the Agreement requires consent of the Originator for an assignee to take an enforceable interest in the Agreement from an assignor. The Court is unconvinced by Plaintiff's arguments and finds that Section 18 did, and does, apply in this action.  Plaintiff must meet its burden of persuasion to show that it obtained the interest it claims in the Agreement in compliance with the Agreement's terms.  That burden has not been met and Plaintiff thus has not shown a likelihood of success on the merits.

Finally, the Court considered the possibility that the conduct of the parties somehow modified or waived the consent to assignment term of the Agreement. Again, there is no factual or legal authority to support that Section 18 of the Agreement was not required to be met here.  Under North Carolina law:

> The provisions of a written contract may be modified or waived by a
> subsequent parol agreement, or by conduct which naturally and justly

> leads the other party to believe the provisions of the contract have been modified or waived, even though the instrument involved provides that only written modifications shall be binding.

Son-Shine Grading, Inc. v. ADC Const. Co., 315 S.E.2d 346, 349 (N.C. Ct. App. 1984) (citing W.E. Garrison Grading Co. v. Piracci Construction Co., Inc., 221 S.E.2d 512 (N.C. 1975)).

In Bombardier Capital, Inc. v. Lake Hickory Watercraft, Inc., 632 S.E.2d 192, 196 (N.C. Ct. App. 2006), the Court of Appeals of North Carolina recently held:

> This Court has established that waiver is an intentional relinquishment or abandonment of a known right or privilege. A waiver may be express or implied. A waiver is implied when a person dispenses with a right by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right.

632 S.E.2d at 196 (internal quotation and citations omitted).

There is no evidence, nor is there any allegation in the Complaint, regarding dealings between the parties that even suggests that there was a subsequent parol agreement between Defendant and either Silverton, FDIC-R, Brand Banking, or Plaintiff or any conduct "which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived" regarding Section 18.

To the contrary, Defendant has consistently asserted and reserved all of its rights and remedies under the Agreement and has stated so in its letters to Plaintiff.

Defendant contests that Plaintiff has standing to assert rights under the Agreement and denies that Plaintiff has any rights as the Participant.  The Court finds there has not been an express or implied waiver of the right of Defendant to demand that its consent be obtained prior to an assignment of rights under the Agreement.[2]

      C.    Section 17 of the Agreement

Assuming *arguendo* that Plaintiff has standing, the Court considers whether Section 17 provides Defendant with the right to unilaterally make all decisions relating to the loan.  The Court finds that it does.

Plaintiff, at the hearing, invited the Court to read provisions into the Agreement that are not there.  (Tr. of Hr'g at 21:6-22:11).  The Court declines to do so and finds that Section 17 is not limited to the time that a participant is in receivership, is not limited to participants such as the FDIC-R, and does not limit the decisions about the loan that the Originator may make if a receivership occurs. The parties to the Agreement could have included provisions that limited the application of the section upon a subsequent assignment or would have stated that

---

[2] The Court notes that it stated at the hearing that it believed that the language of Sections 7(b) and 15 provided an additional reason to find that there was a failure to establish a substantial likelihood of success on the merits.  Having further reviewed the Agreement, the Court now makes clear that it is a closer call than it first appeared and does not rely upon those sections as grounds for denying the TRO.

it only applied while the FDIC was the receiver for a failed institution. They did not.

Section 17 by its clear and unambiguous terms provides that when Silverton went into receivership, which the parties admit occurred, Defendant became vested with the authority to make "all decisions relating to the Loan" with the same force and effect as if it owned the whole loan.[3] (Agreement § 17). This authority was not qualified in any way. It was not limited only to the time Silverton was in receivership and does not state that this decision-making authority is extinguished if and when the FDIC's receivership terminates. The Court declines to add to this unambiguous language the limitations Plaintiff urges here.

D.     <u>Irreparable injury and threat of injury to Defendant</u>

Having found that there is no substantial likelihood of success on the merits and that Plaintiff likely lacks standing, the Court is not required to address the other factors for granting a TRO. However, the Court further finds that Plaintiff has not met its burden to show that there is a risk of irreparable injury. The Court concludes specifically that Plaintiff has an adequate remedy at law because

---

[3] If the parties to the Agreement intended Section 17 to be limited to only the time period that Silverton was in receivership, they could have specifically stated this limitation. The parties did, in fact, state specific rights limitations in other provisions in the Agreement, such as Sections 7(b) and 15. That they expressly chose not to do so in Section 17 is compelling evidence limitations were not intended.

Plaintiff may recover any losses and damage it claims may be suffered as a result of an alleged breach of the Agreement by Defendant by an award of damages in this action.

In light of the fact that Plaintiff asserted at the hearing that Borrower owes more on the property than it is worth, the Court also finds there is a greater potential for injury to Defendant's interests — as the majority shareholder of the Note — than there is to Plaintiff if the injunction were to be granted and foreclosure on the Property was expedited.  (Tr. of Hr'g at 32:11-15).

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** Plaintiffs' Motion for Temporary Restraining Order is **DENIED**.


**SO ORDERED** this 9th day of December, 2011.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE